IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RASHEEM A. BAILEY, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SOUTH JERSEY PORT CORPORATION | : | |
| | : | NO. 19-12316 |

MEMORANDUM

Bartle, J.                                                                September 23, 2020

        Plaintiff Rasheem Bailey ("Bailey") brings this action against his former employer, defendant South Jersey Port Corporation ("the Port"), alleging racial discrimination in employment in violation of: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); (2) 42 U.S.C. § 1981, interference with right to contract; (3) 42 U.S.C. § 1981, infringement of right of equal benefit; and (4) the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq.

        Bailey, who is African-American, asserts that his employer, the Port, fired him because of racial animus. Before the court is the motion of defendant for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

I

        Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). We view the facts and draw all inferences in favor of the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted when there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. See Anderson, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id. In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

II

The following facts are undisputed. Bailey is an African-American male who was hired as a security officer at the Port in October 2015. On October 22, 2018, an incident occurred

2

between Bailey and another security guard, Joseph Puglia ("Puglia"), a white male.  Bailey and another security guard, Stephen Scott ("Scott"), were scheduled to take over at 4:00 p.m. from Puglia and Juan Mojica ("Mojica").  Although each of these men provided his own version of events from that afternoon, the main events occurred as follows:

Bailey arrived at the security guard booth around 3:45 or 3:50 p.m. and complained to Puglia and Mojica about the messiness of the booth, as he had on previous occasions.  Puglia slid the booth door shut in Bailey's face.  Bailey opened the door and continued complaining.  Bailey alleges that Puglia told him to "shut the f--k up, n----r" and repeated this twice more.  Puglia denies using the "N-word" and says that he only told Bailey to leave him alone.  Puglia asserts that Bailey asked if he wanted to fight, which Puglia declined.  Mojica was at the booth during this exchange and denies hearing Puglia use the "N-word."

Puglia left the booth to clock out at the office trailer, which is situated fifteen to twenty feet away from the guard booth.  Bailey followed him and continued arguing with him.  Mojica stated that Bailey initiated physical contact with Puglia and pushed Puglia in the collarbone.  Scott, who was approaching the guard booth after signing in, saw Bailey leave the booth to confront Puglia and challenge him to a fight.

Scott stated that Puglia kept trying to avoid Bailey, but Bailey kept following him and challenging him to a fight.

Eventually, Bailey and Puglia got into a shoving match, and Scott and Mojica broke them apart. Mojica was facing Puglia with his back to Bailey when he saw a hand come over his shoulder and heard contact with Puglia. Mojica heard Puglia say something to the effect of "Did you just hit me?" and saw redness on Puglia's face. Scott was facing Bailey but did not see anything because his head was in Bailey's chest. He heard Puglia say something to the effect of "You hit me." Puglia claims that Bailey hit him in the face. Bailey denies this.

Gary Schreyer ("Schreyer"), a Port office employee, was working in the office trailer at the time of the incident. He heard Bailey challenge Puglia to a fight and say that Bailey would clock out to fight him. Schreyer heard Puglia tell Bailey to leave him alone. Schreyer looked outside and saw Bailey backing Puglia up while the two men argued. Schreyer saw Puglia put his hands up and then saw Bailey punch Puglia. Schreyer saw Scott and Mojica break the two men apart.

Bailey disagrees with the assertion that he challenged Puglia to a fight or that he said he would clock out to fight Puglia. However, Bailey stated that he agreed with Mojica and Scott's versions of events, and both men stated that they heard Bailey challenge Puglia to a fight. In addition, Bailey's

4

timecard from that day shows that he clocked in at 3:46 p.m. and clocked out at 3:53 p.m.  Bailey agreed in his statement of facts in opposition to the motion of defendant for summary judgment that he challenged Puglia to a fight and that he initiated physical contact with Puglia.

After this confrontation, Puglia called his supervisor, who in turn called Kevin Greenjack ("Greenjack"), the security captain at the Port.  Greenjack arrived on scene and spoke to Puglia and Bailey separately about each man's version of events.  Greenjack then called Joseph O'Leary ("O'Leary"), the security manager and facility security officer for the Port, who spoke with Bailey on the phone and told him to go home for the day and not complete his 4:00 p.m. to 12:00 a.m. shift.

The Port investigated the incident and collected written statements from Bailey, Puglia, Mojica, Scott, and Schreyer.  The Port also retrieved Bailey's timecard from that day and Puglia's medical records from his October 23, 2018 visit to the doctor.  On the day after the incident, October 23, 2018, Bailey, Puglia, a union representative, Greenjack, and O'Leary met in person.  Bailey turned in his written statement at this time and both Bailey and Puglia gave an oral version of their events of the previous day.

At the end of the meeting, the Port officials informed Bailey that the Port would make a decision and contact him. Later that day, Port officials contacted Bailey to inform him that they had determined he was the aggressor and that Puglia sought to avoid confrontation. The Port advised Bailey that he was terminated. Puglia remained on the job. O'Leary memorialized the findings, as well as which rules of conduct Bailey's behavior violated, and sent a memorandum of these findings to Bailey later that day.

### III

Bailey asserts that the Port terminated his employment because of race. Title VII provides in relevant part:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).

To defeat the motion of defendant for summary judgment on his claim for racial discrimination under Title VII, Bailey must prove: (1) he was a member of a protected class; (2) he was qualified for the position he sought to retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an

inference of discrimination.  Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 327 (3d Cir. 2015).

If Bailey succeeds in making out a prima facie case, then the burden of production shifts to his employer to provide a "legitimate, non-discriminatory reason for the adverse employment action."  See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).  If the employer can provide such a reason, then "the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination."  Id.  The burden on defendant to show a non-discriminatory reason is light.  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  At all times, the burden of proof remains on the plaintiff.  Id.

To defeat summary judgment when defendant has provided a non-discriminatory reason, plaintiff must provide evidence, either direct or circumstantial, so that a reasonable factfinder could "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Id. at 764.

There is no dispute that Bailey is a member of a protected class as an African-American man, that he was qualified for his position, and that his termination constituted an adverse employment action.  Thus, we will focus our inquiry

7

on the fourth prong of the prima facie case, that is, whether there is evidence that Bailey's termination occurred under circumstances that could give rise to an inference of discrimination on the basis of race.

A plaintiff can demonstrate an inference of discrimination by showing that similarly situated employees not in plaintiff's protected class were treated more favorably. Mandel v. M & Q Packaging Corp., 706 F.3d 157, 170 (3d Cir. 2013). "Similarly situated" means that "purported comparators must have committed offenses of comparable seriousness." Dykes v. Marco Grp., Inc., 222 F. Supp. 3d 418, 427 (E.D. Pa. 2016).

Bailey asserts that an inference of racial animus can be surmised from the fact that both Bailey and Puglia were involved in a fight, yet only Bailey, an African-American man, was terminated while Puglia, a white man, was not.

After reviewing the record, we conclude that Bailey has not produced evidence for a jury to find that his termination occurred under circumstances that could give rise to an inference of race discrimination. As the Port informed Bailey and memorialized in writing, the Port terminated Bailey because it determined, as a result of an investigation, that he was the aggressor, initiated the confrontation with Puglia, and threw a punch at Puglia. The Port listed the multiple rules in

8

the employee code of conduct that Bailey violated, including "inciting disorder or interfering with a guard or supervisor in the lawful performance of his or her duties" and "fighting or striking another employee . . . on the Port property."

Bailey may argue that Puglia was a similarly situated employee and did not suffer an adverse action, but Puglia was not similarly situated to Bailey based on the evidence provided. Puglia was a part of this altercation, but none of the witnesses states that he was the aggressor or initiated contact or punched Bailey in this incident. They all stated that it was Bailey who was the aggressor and kept challenging Puglia to a fight.

Bailey claims that Puglia started the confrontation by calling him the "N-word." None of the other witnesses heard Puglia say this. Even assuming, however, that Bailey's version is correct, and that he could satisfy his prima facie case by making out an inference of discrimination since both men initiated this fight but only Bailey was fired, the Port has provided a legitimate, non-discriminatory reason for terminating Bailey.

It is undisputed that the Port conducted an investigation, which included collecting records, eyewitness interviews, and statements, and determined that Bailey alone was the aggressor and initiated this confrontation. The Port concluded from this investigation that Bailey punched Puglia.

9

The Port also determined during its investigation that Puglia was not responsible for the fight but rather tried to remove himself from the situation.  Since the Port found that Bailey's actions, and not Puglia's actions, violated company policy for employee conduct, the Port had a legitimate, non-discriminatory reason to fire Bailey and not Puglia.

Bailey has failed to provide any evidence that the Port's reason for his termination is mere pretext so that a reasonable factfinder could either disbelieve the Port's reason or believe that an invidious reason was a motivating factor. Bailey has produced nothing that shows that race played any part in the Port's actions.  Instead, he raises two past incidents in which he claims the Port suspended him but not his white or Hispanic coworkers to argue that race motivated the Port's actions.

The Port only has record of one previous punishment, from May 2017, and Bailey cannot recall the date of the other incident.  In May 2017, the Port explained that it suspended Bailey for failing to prevent trespassers on the property. Bailey's only argument is that the other guard on duty, a Hispanic man, was not punished for the same incident and that both blamed the other person for the trespass.  O'Leary certified on behalf of the Port that it suspended Bailey because it has surveillance video of Bailey alone and asleep in the

10

guard booth when the trespassers walked by while the other guard was doing rounds of the property and found the trespassers to escort them off the property.

Absent any other evidence, Bailey has failed to provide enough evidence for a reasonable factfinder to determine that an invidious reason motivated the Port when it fired Bailey for the October 22, 2018 incident.  Accordingly, the court will grant the motion of defendant for summary judgment as to Count I of plaintiff's complaint regarding racial discrimination under Title VII.

IV

We turn next to plaintiff's two claims under 42 U.S.C. § 1981.  Plaintiff alleges in Count II of his complaint that defendant interfered with plaintiff's ability to enforce a contract.  In Count III, plaintiff claims that defendant infringed on plaintiff's right to equal benefit of the law. Section 1981 provides:

> All persons within the jurisdiction of the
> United States shall have the same right in
> every State and Territory to make and
> enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit
> of all laws and proceedings for the security
> of persons and property as is enjoyed by
> white citizens, and shall be subject to like
> punishment, pains, penalties, taxes,
> licenses, and exactions of every kind, and
> to no other.

42 U.S.C. § 1981.

Claims of disparate treatment under § 1981 are analyzed under the same burden shifting framework as Title VII claims.  See Jones v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).  Accordingly, the court finds as it did on plaintiff's Title VII claim and grants summary judgment in favor of defendant as to Counts II and III of plaintiff's complaint regarding discrimination pursuant to § 1981.

V

Finally, plaintiff claims that his termination violated the NJLAD.  See N.J.S.A. 10:5-1 et seq.  As with plaintiff's § 1981 claims, analysis of a NJLAD claim follows the same analysis as a Title VII claim.  See Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999).  Therefore, the result under the NJLAD is the same as the result under Title VII.  Accordingly, the court will grant summary judgment in favor of defendant as to Count IV of plaintiff's complaint regarding discrimination pursuant to the NJLAD.